[Cite as *State v. S.D.K.*, 2021-Ohio-63.]

COURT OF APPEALS OF OHIO

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

STATE OF OHIO, :

    Plaintiff-Appellee, :

    v. :

S.D.K., :

    Defendant-Appellant. :

No. 109195

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** January 14, 2021

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-19-641176-A

*Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Carl J. Mazzone, Assistant Prosecuting Attorney, *for appellee.*

Cullen Sweeney, Cuyahoga County Public Defender, and Noelle A. Powell, Assistant Public Defender, *for appellant.*

MARY J. BOYLE, A.J.:

{¶ 1} Defendant-appellant, S.K., appeals his conviction of violating a protection order. He raises two assignments of error for our review:

1. [S.K.]'s conviction is against the manifest weight of the evidence and, accordingly, [S.K.] was denied his fundamental right to a fair trial as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution.

2. [S.K.] was deprived of due process and a fair trial when the jury was permitted to hear evidence of a prior conviction of the same crime to support a "furthermore" clause.

{¶ 2} Finding no merit to his assignments of error, we affirm S.K.'s conviction.

## I. Procedural History and Factual Background

{¶ 3} In June 2019, S.K. was charged with one count of violating a protection order in violation of R.C. 2919.27(A)(1). The count carried a furthermore clause alleging that S.K. had been convicted of violating a protection order in 2018, which elevated the offense to a fifth-degree felony.

{¶ 4} In September 2019, a jury trial ensued. Before jury selection, the state informed the trial court that the parties had stipulated that S.K. had a prior conviction of violating a protection order. S.K.'s counsel asked the court to "consider accepting a jury waiver to the furthermore specification," and the court told S.K.'s counsel, "you can't do that." The state presented the following evidence at trial.

{¶ 5} T.M., S.K.'s ex-wife, testified that S.K. was subject to a protection order that was issued in November 2017 and effective through October 2020. The state submitted the order into evidence, and T.M. agreed it was a current copy. The parties also stipulated to the authenticity of the protection order. T.M. read part of the order to the jury:

S.K. "shall stay away from [T.M.] and all other protected persons named in this order and not be present within 500 feet or distance of any protected persons wherever those protected persons may be found or any place [S.K.] knows or should know the protected persons are likely to be[.] * * * This order includes encounters on public and private roads, highways, and thoroughfares."

The protection order includes a map of T.M.'s neighborhood in Euclid, and T.M. agreed the map shows that the Euclid High School parking lot is within the restricted 500-foot zone around her house.

{¶ 6} T.M. testified that on May 18, 2019, her neighbor, Toya Scott, told her that S.K. was near T.M.'s house the previous day. On May 18, T.M. went to the Euclid Police Department and made a written statement based on what Scott had told her. T.M. explained that she was at home in the afternoon of May 17, but she did not see S.K. herself.

{¶ 7} Scott testified that she has lived on Tracy Avenue next door to T.M. for 11 years. She described her relationship with T.M. as "just neighbors" and explained that that they do not regularly "hang out" with each other. She knows S.K. from when he lived with T.M. and their children on Tracy Avenue, and she identified him in the courtroom. Scott knew that after T.M. and S.K. divorced, S.K. was not permitted to be near T.M.'s house. Scott explained that one day she was doing yard work, and T.M. mentioned that "she was having some issues" with S.K. and asked Scott to let her know if she "see[s] anything."

{¶ 8} Scott explained that their houses on Tracy Avenue are between East 222 Street to the west and East 228 Street to the east, and they are directly across the street from the Euclid High School parking lot.

{¶ 9} Scott testified that around 9:30 a.m. on May 17, 2019, she was in the passenger seat of her car, with her fiancé driving, when they stopped at a stop sign on the corner of Tracy Avenue and East 228 Street, facing the Euclid High School parking lot. While they were stopped, Scott observed S.K. drive west on Tracy Avenue and turn into the high school parking lot. Scott said that she did not recognize the vehicle, but she was "most certain" and "positive" that the driver of the vehicle was S.K., and that nobody else was in the car with him.

{¶ 10} Scott and her fiancé followed S.K. into the parking lot "to see what he was going to do." She said that S.K. stayed in the parking lot, with his car facing Tracy Avenue across from T.M.'s house, for five to ten minutes. She testified he then left the parking lot and drove west on Tracy Avenue toward East 222 Street. Scott and her fiancé continued to follow S.K. Scott observed S.K. slow down as he passed T.M.'s house and then stop at the traffic light at the intersection of Tracy Avenue and East 222 Street. Scott and her fiancé were still behind S.K., and Scott took a photo of the license plate of the car S.K. was driving. S.K. then turned north onto East 222 Street, drove a few blocks, and turned into the Euclid Public Library parking lot. Scott and her fiancé followed S.K. north on East 222 Street and kept driving after S.K. turned into the library. They then returned home. Scott said she tried to contact

T.M. that day, but T.M. did not appear to be home, and Scott did not have her cell phone number. The next morning, Scott gave T.M. the photo.

{¶ 11} The state submitted Scott's photo as an exhibit, and Scott identified it as the photo she had taken. The photo reflects a Toyota and its rear license plate number. Also visible in the photo is a white picket fence, a house with a white awning and a white roof pitch, another house with a white awning, and a telephone pole with black electrical boxes on either side. The state also submitted as an exhibit a Google street-view image of the intersection of Tracy Avenue and East 222 Street. Visible on the east side of East 222 Street from that intersection are landmarks that Scott agreed look like those in the photo she took when she was at that intersection: a white picket fence, a house with a white awning and a white roof pitch, another house with a white awning, and a telephone pole with black electrical boxes on either side.

{¶ 12} Scott testified that sometime after she gave the photo to T.M., police officers came to her house to question her. She said she did not make a statement because she did not want to get involved in her "neighbor's business." She explained that she was testifying at trial under subpoena and "for safety reasons." Scott said that although she initially did not want to be involved, she was now glad that she did because she and T.M. are both single mothers and need to "look out for each other."

{¶ 13} On cross-examination, Scott agreed that the Euclid High School, the Euclid Public Library, and the Euclid Police Department are all in a complex together, and their parking lots connect. She admitted that she did not call the police

or "drive the other 200 feet" to the police department when she saw S.K. near T.M.'s house. She agreed that she never told police that her fiancé had also been in the car with her.

{¶ 14} Patrolman Michael Roulan of the Euclid Police Department testified that he met with T.M. when she came to the police department on May 18, 2019, and he prepared a report. He followed up with Scott, who seemed "a little bit" nervous and who was not willing to provide a written statement. Officer Roulan testified that he ran the Toyota's license plate number and identified the owner of the Toyota as Andrea Handcock. He ran Handcock's name through the LEADS database, and she did not appear to be subject to a protection order. He testified that he tried to contact Handcock but was unsuccessful.

{¶ 15} Detective John Braun of the Euclid Police Department testified that at the request of the Euclid prosecutor, he investigated this case in June 2019 and discovered that S.K. had a prior conviction for violating a protection order. The state submitted into evidence the journal entry for the prior conviction and told Detective Braun "this was previously stipulated to." Detective Braun confirmed that the judgment entry was a conviction for a violation of a protection order in 2018.

{¶ 16} Detective Braun testified that a stationary license plate reader at the intersection of Euclid Avenue and East 222 Street captured a photo of Handcock's Toyota at that intersection at 12:25 p.m. on May 17, 2019. He agreed that he did not obtain surveillance footage from the Euclid High School parking lot, talk to anybody from the school, obtain a search warrant for data related to S.K.'s cell phone to see

where his cell phone was on May 17, or obtain a search warrant for Scott's cell phone to examine when and where she took the photo of Handcock's Toyota.

{¶ 17} Handcock testified that she is friends with S.K. and owns the Toyota in the photo that Scott had taken. She said that S.K. does not have his own vehicle, and if he needed to go somewhere, she would drive him. She explained that she would not allow S.K. to use her Toyota by himself.

{¶ 18} Handcock stated that she went to S.K.'s house after work on Thursday, May 16, 2019, and spent the night there. She testified that around noon on May 17, she left S.K.'s house and drove her Toyota to the McDonald's on East 222 Street and then to CVS on Lakeshore Boulevard in Euclid. She said S.K. was not with her in the Toyota. Handcock explained that to get from McDonald's to CVS, she drove north on East 222 Street, crossing through the intersection of East 222 Street and Tracy Avenue. She testified that she was never physically on Tracy Avenue or at the Euclid High School parking lot. She said that after she left CVS, she returned to S.K.'s house until 3:00 p.m. when she went home. She testified that from Thursday evening to Friday at noon, she, S.K., and her Toyota were at S.K.'s house and did not leave.

{¶ 19} Handcock said that she had told S.K.'s counsel that she was with S.K. on Thursday and Friday, May 16 and 17, and that his counsel asked her to write that down. The state submitted into evidence the letter that Handcock had written for S.K.'s counsel, and Handcock read it to the jury:

To whom it may concern[:]

My name is Andrea. I am a friend of [S.K.]. On Thursday, May 16, 2019, I (Andrea) was with [S.K.] on 1818 Lampson at his home all day[,] and I was also at [S.K.]'s home on Friday, May 17, 2019. I did not leave [S.K.]'s home Thursday until Friday around 3pm. [S.K.] never left his home while I was there those 2 days.

Respectfully Submitted[,]

Andrea Handcock

{¶ 20} Handcock acknowledged that she wrote that she did not leave S.K.'s house until 3:00 p.m. on May 17, and she explained that at the time she wrote the letter, she had forgotten that she had run errands around noon. She agreed that she did not tell S.K.'s counsel that she remembered she left S.K.'s house around noon, and she did not submit a revised or supplemental letter. Handcock admitted that the first time she told anybody that she left around noon was when the prosecutor called her to ask her why her Toyota was spotted by a traffic camera on East 222 Street around 12:30 p.m. on Friday, May 17. She also agreed that she told the prosecutor on that call that somebody had been following her "a while back" and could have taken the photo of her Toyota, and she had filed a report with the Euclid Police Department. Detective Braun testified that he ran Handcock's name through the Euclid Police System for occurrences in police reports in 2018 and 2019, and he received no results other than this case.

{¶ 21} At the end of the state's case, S.K. moved for a Crim.R. 29(A) acquittal. The trial court denied the motion. S.K. did not call any witnesses.

{¶ 22} After deliberations, the jury found S.K. guilty of violating a protection order, with the furthermore clause that S.K. was previously convicted of or pleaded

guilty to violating a protection order. The trial court referred S.K. for a presentence investigation report. In October 2019, the trial court sentenced S.K. to twelve months of incarceration with a discretionary period of up to three years of post-release control, and waived costs and fines.

{¶ 23} S.K. timely appeals from the sentencing judgment.

## II. Manifest Weight of the Evidence

{¶ 24} In S.K.'s first assignment of error, he argues that his conviction is against the manifest weight of the evidence because Scott was the only witness to "place" him "where he should not have been." He maintains that Scott's fiancé did not testify, the photo Scott took does not show S.K. in the vehicle, and the Toyota was not registered to S.K.

{¶ 25} A challenge to the manifest weight of the evidence tests whether the prosecution has met its burden of persuasion. *State v. Thompkins*, 78 Ohio St.3d 380, 388, 678 N.E.2d 541 (1997). In determining whether a conviction is against the manifest weight of the evidence, the court of appeals functions as a "thirteenth juror." *Id.* at 387. In doing so, it must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine "'whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Id.*, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). Reversing a conviction as being against the manifest weight of the evidence and ordering a new trial should be reserved for only

the "'exceptional case in which the evidence weighs heavily against the conviction.'" *Id.*, quoting *Martin*.

{¶ 26} In this case, the jury heard conflicting testimony from Scott and Handcock. Scott testified that she saw S.K. on Tracy Avenue and at the Euclid High School parking lot on the morning of May 17, 2019. But Handcock testified that she, S.K., and her Toyota were at S.K.'s house that morning and were not on Tracy Avenue or the school parking lot. In resolving this conflict in the evidence, the jury decided to believe Scott's testimony over Handcock's.

{¶ 27} After reviewing the record, we do not find that the jury clearly lost its way. Although Scott's fiancé did not testify, the photo Scott took of Handcock's Toyota at the intersection of Tracy Avenue and East 222 Street corroborates her testimony. The fact that S.K. is not in the photo does not hurt Scott's credibility. Scott did not recognize the Toyota and would have no reason to think it was S.K.'s if she did not see him in the car. Scott testified that she was "most certain" and "positive" that S.K. was driving the Toyota. Furthermore, the fact that the Toyota was not registered to S.K. is of no consequence. Handcock testified that she owned the Toyota and that she is friends with S.K.

{¶ 28} Handcock's testimony was also inconsistent. She wrote a letter for S.K.'s counsel that stated that she was at S.K.'s house with him "all day" on Thursday, May 16, and until 3:00 p.m. on Friday, May 17. But after the prosecutor told Handcock that a license plate reader captured a photo of her Toyota on East 222 Street at 12:25 p.m. on May 17, she claimed for the first time that she was out running

errands in the area.  Having suddenly remembered that fact, Handcock did nothing to update her statement or tell S.K.'s counsel.

{¶ 29} After reviewing the entire record and weighing the evidence and all reasonable inferences, we find that the jury did not clearly lose its way and create such a manifest miscarriage of justice that S.K.'s conviction must be reversed and a new trial ordered.  This is simply not the exceptional case where the evidence weighs heavily against the conviction.

{¶ 30} Accordingly, we overrule S.K.'s first assignment of error.

## III.  Evidence of Prior Conviction

{¶ 31} In his second assignment of error, S.K. argues that the trial court improperly admitted evidence that S.K. had a previous conviction for violating a protection order.  He maintains that the jury learning that he had previously been convicted for violating a protection order prejudiced him and deprived him of due process.  Specifically, he contends that the trial court erred in prohibiting a jury waiver as to the furthermore clause, informing the jury about the parties' stipulation of S.K.'s prior conviction, and admitting into evidence the journal entry reflecting S.K.'s prior conviction.

{¶ 32} The record shows that S.K.'s counsel did not object to the trial court's denial of a jury waiver for the furthermore clause, to the admission of the journal entry showing S.K.'s prior conviction, or to Detective Braun's testimony that the journal entry did show a prior conviction.  As such, S.K. has waived all but plain error on appeal.  Under Crim.R. 52(B), "[p]lain errors or defects affecting

substantial rights may be noticed although they were not brought to the attention of the court." The plain-error rule is to be invoked only under exceptional circumstances to avoid a manifest miscarriage of justice. *State v. Long*, 53 Ohio St.2d 91, 97, 372 N.E.2d 804 (1987). Plain error does not occur unless, but for the error, the outcome of the trial clearly would have been different. *Id.*

{¶ 33} First, the trial court did not err when it denied S.K.'s request for a jury waiver regarding the furthermore clause. "When a prior conviction elevates a misdemeanor to a felony, 'the prior conviction is an essential element of the crime, and must be proved by the state.'" *State v. Tate*, 138 Ohio St.3d 139, 2014-Ohio-44, 4 N.E.3d 1016, ¶ 17, quoting *State v. Allen*, 29 Ohio St.3d 53, 54, 506 N.E.2d 199 (1987). "A defendant is not entitled to bifurcated proceedings, nor may he waive jury trial on the prior conviction element alone." *State v. Casalicchio*, 8th Dist. Cuyahoga No. 79431, 2002 Ohio App. LEXIS 547, 17 (Feb. 14, 2002), citing *State v. Sweeney*, 131 Ohio App.3d 765, 773, 723 N.E.2d 655 (2d Dist.1999). R.C. 2919.27(B)(3) provides that violating a protection order is a fifth-degree felony if the offender has a prior conviction for violating a protection order or consent agreement. Such a prior conviction is therefore an essential element of the crime, and S.K. could not bifurcate the element or waive a jury trial on this element alone. The state needed to prove such a prior conviction to prove the furthermore clause in Key's indictment.

{¶ 34} Second, the trial court did not err when it admitted the parties' stipulation and the journal entry reflecting S.K.'s prior conviction because a prior

conviction specifically for violating a protection order is an element of the crime. To prove a prior conviction, "a certified copy of the entry of judgment in such prior conviction together with evidence sufficient to identify the defendant named in the entry as the offender in the case at bar" is "sufficient." R.C. 2945.75(B)(1). However, a defendant may "stipulate to a prior conviction to avoid the evidence being presented before a jury." *State v. Gwen*, 134 Ohio St.3d 284, 2012-Ohio-5046, 982 N.E.2d 626, ¶ 14.

{¶ 35} S.K. relies on *State v. Creech*, 150 Ohio St.3d 540, 2016-Ohio-8440, 84 N.E.3d 981, in which the Ohio Supreme Court found that the trial court abused its discretion when it did not allow the defendant to stipulate to his prior convictions and admitted evidence of the defendant's full record of prior offenses. In *Creech*, the state needed to prove that the defendant had a prior conviction of a felony offense of violence or a felony drug offense. *Id.* at ¶ 34. The court found that the state's evidence of the "name and nature" of the defendant's prior offenses unfairly prejudiced him, whereas a stipulation that the defendant had a prior conviction within the broad categories of a felony offense of violence or a felony drug offense would have been sufficient. *Id.* at ¶ 36-38. S.K. also relies on *State v. Floyd*, 8th Dist. Cuyahoga No. 104376, 2017-Ohio-386, in which this court, relying on *Creech*, found that the trial court abused its discretion in allowing evidence of the name of the defendant's prior conviction when the parties stipulated to a prior conviction generally, and the name of the offense was not necessary to establish the disability.

{¶ 36} S.K.'s reliance on *Creech* and *Floyd* is misplaced. Unlike in those cases, the state did need to prove that S.K. was previously convicted specifically for violating a protection order — the name of the offense here is an element of the crime. This case is more like *Cleveland v. Giering*, 2017-Ohio-8059, 98 N.E.3d 1131 (8th Dist.), in which the prosecution needed to prove a prior conviction for operating a vehicle while intoxicated ("OVI"). In *Giering*, we found that the trial court did not err in accepting the parties' stipulation that the defendant had a prior OVI conviction and admitting the certified docket entry reflecting the conviction. *Id.* at ¶ 23. A prior OVI conviction was an element of the offense, and "[t]here was never a mystery to protect as to what Giering's prior offense had been." *Id.* at ¶ 24. The state did not present any evidence of the details underlying the previous OVI, and this court found that the trial court did not violate *Creech*'s holding. *Id.* at ¶ 24-25.

{¶ 37} Like in *Giering*, the trial court in this case accepted the parties' stipulation of S.K.'s prior conviction for violating a protection order and admitted into evidence the journal entry reflecting the conviction. Before opening statements, the trial court read the furthermore clause to the jury. There was no mystery to protect as to what S.K.'s prior offense was. During opening statements, the prosecutor told the jury that "nobody is disputing" that "there is a protection order and that it's been violated once. You can consider that for no other reason than the fact that it's in the indictment." In the state's case in chief, the prosecutor submitted the journal entry of prior conviction into evidence, showed it to Detective Braun with the statement that "this was previously stipulated to," and asked Detective Braun if

the entry was a conviction for a violation of a protection order. The state elicited no further testimony regarding the facts underlying the previous conviction. The trial court also provided a limiting jury instruction:

> Evidence was received that the defendant was convicted of violating a protection order. That evidence is an element of the offense charged. It was not received and may not be considered to prove the character of the defendant in order to show that he acted in conformity or in accordance with that character.

{¶ 38} The admission of evidence regarding S.K.'s prior conviction for violating a protection order is not an error affecting a substantial right that would have changed the outcome of trial. The trial court did not err in admitting such evidence. We therefore overrule S.K.'s second assignment of error.

{¶ 39} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY J. BOYLE, ADMINISTRATIVE JUDGE

SEAN C. GALLAGHER, J., and
KATHLEEN ANN KEOUGH, J., CONCUR