[Cite as *State v. Thomas*, 2024-Ohio-1534.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MARION COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

  v.

TEDDY THOMAS, III,

    DEFENDANT-APPELLANT.

CASE NO. 9-23-65

O P I N I O N

Appeal from Marion County Common Pleas Court
Trial Court No. 22-CR-115

Judgment Affirmed in Part, Reversed in Part and Cause Remanded

Date of Decision:  April 22, 2024

APPEARANCES:

    *April F. Campbell* for Appellant

    *Allison M. Kesler* for Appellee

**WALDICK, J.,**

{¶1} Defendant-appellant, Teddy Thomas, III ("Thomas"), appeals the September 6, 2023 judgment of conviction and sentence entered against him in the Marion County Court of Common Pleas, following a jury trial in which Thomas was found guilty of multiple felony offenses. For the reasons that follow, we affirm in part and reverse in part.

*Procedural History and Factual Background*

{¶2} This case originated on February 16, 2022, when the Marion County grand jury returned a five-count indictment against Thomas, charging him as follows: Count 1 – Attempted Murder, a first-degree felony in violation of R.C. 2923.02 and R.C. 2903.02(A); Count 2 – Felonious Assault, a first-degree felony in violation of R.C. 2903.11(A) and (D)(1)(a); Count 3 – Aggravated Burglary, a first-degree felony in violation of R.C. 2911.11(A); Count 4 – Domestic Violence, a fourth-degree felony in violation of R.C. 2919.25(A) and (D)(3); and Count 5 – Inducing Panic, a fourth-degree felony in violation of R.C. 2917.31(A)(2) and (C)(3). Counts 1, 2, and 3 each also contained a Repeat Violent Offender specification pursuant to R.C. 2941.149(A).

{¶3} On February 22, 2022, an arraignment was held and Thomas entered a plea of not guilty to all counts in the indictment. Seventeen months of pretrial proceedings then ensued.

{¶4} On July 25, 2023, a jury trial commenced in the case. During the course of the three-day trial, both the prosecution and the defense presented evidence.

{¶5} During the state's case in chief, evidence was introduced that on February 12, 2022, the Marion County Sheriff's Office 911 dispatch center received two 911 calls from 329 Fies Avenue in Marion. In the first call, the caller identified himself as 13-year-old Teddy Thomas and reported that "there's somebody that's beating on my mom" and "destroying the house." Teddy identified his mother as Brittany Goddard and, in response to being asked if an ambulance was needed in addition to the police, he said his mother had injuries to her face, after being hit in the face several times. Teddy identified the perpetrator as "Teddy Thomas, III." Young Teddy reported that Thomas was drunk, was trying to break in the house, and the family was hiding upstairs. In the second call, the caller identified herself as Brittany Goddard. Goddard was frantic and crying, requesting help because, she said, Thomas was "going fucking crazy" and had beat her. Goddard indicated that she and her children were hiding upstairs in the home and Thomas was trying to break in downstairs.

{¶6} In response to those 911 calls, multiple police officers were immediately dispatched to 329 Fies Avenue. Officer Katrina Rostorfer of the Marion Police Department was the first officer on scene. Upon arrival, Rostorfer observed that a window was broken on the front of the house. Rostorfer was unable to make contact with anyone at the home, but could hear yelling inside the house.

The front door was locked, and so Rostorfer went to the back of the house and found the other door to be locked as well. Additional officers then arrived, and Rostorfer took up a position at the rear of the home.

**{¶7}** Marion Police Department Officers Nicholas Geurkink and Caleb Rector were the next officers to arrive at 329 Fies Avenue. Geurkink and Rector were both wearing standard police uniforms that clearly identified them as law enforcement officers. The two male officers approached the front door, loudly identifying themselves as police officers. Rector then kicked the door open as Geurkink continued announcing themselves as police. Once the door had been forced open, the officers paused before entering. At that moment, Thomas came rushing toward the front door from inside the home, brandishing a machete. As Thomas reached the open front door, he swung the machete toward Rector, missing the officer's face and head by just a few inches. The officers fell back momentarily, then entered the home and screamed for Thomas to drop the knife, which Thomas did not do. As the officers gave chase with guns drawn, Thomas ran down a hallway and barricaded himself in a room at the back of the house. While waiting for additional backup, Geurkink and Rector stood guarding the interior entrance to that room at gunpoint, while Officer Rostorfer remained outside, securing the rear of the residence.

**{¶8}** Numerous other officers responded to the scene, including the SWAT team and a crisis negotiator. Police located Brittany Goddard and her children in

the upstairs of the home, and evacuated them from the residence. Thomas remained closeted in the home's back room on the first floor. For nearly two hours, Thomas refused to exit the room and continued to brandish the machete, while making numerous profanity-laced threats of harm and death toward the officers and others. During that time, Fies Avenue was closed down by the police, and officers awakened the persons in the houses closest to 329 Fies Avenue and required those persons to leave their homes for safety reasons.

{¶9} After several futile attempts by police to negotiate a surrender, Thomas finally gave himself up and was taken into custody without further incident. In the back room where he had been barricaded, officers recovered two large machetes, one of which was identified as the one Thomas had used when attempting to slash Officer Rector.

{¶10} Following Thomas's arrest, Brittany Goddard gave a brief statement that same evening to Officer Rector, about which Rector also testified at trial. Goddard told Rector that Thomas, with whom she has children, came over that evening. Goddard explained that she and Thomas were drinking and they started arguing over how Thomas was treating one of the children, and then Thomas snapped and began assaulting her. Goddard told Rector that after Thomas punched her in the face, she fled outside, where Thomas followed, threw her off the porch, and began kicking her. Goddard stated that she was able to get away from Thomas

and she ran back into the house, locked the door, gathered the children, and then she could hear Thomas was breaking into the home.

{¶11} In addition to testimony from multiple police officers about their observations and actions when responding to the incident, the prosecution introduced into evidence audio-video footage taken that evening by the body cameras of Officers Rostorfer, Geurkink, and Rector. Audio-video footage from the body camera of another responding officer, Sebastian Walker, was also introduced, and contained statements made by Goddard to Walker during the incident. Walker also testified about injuries to Goddard's face that he observed that night at the scene. Another officer, Lieutenant Ed Brown, who served as the crisis negotiator for the Marion Police Department, testified as to information Goddard provided to him at the scene, regarding what had happened that night before the police arrived. Numerous photographs taken at the residence that night following Thomas's arrest were also introduced. Among other things, the photos depicted the exterior of the house, the layout of the home's interior, the room where Thomas had barricaded himself, and damage to the home, including broken windows and interior doors that were off their hinges and appeared to have been thrown on the floor. Also introduced into evidence by the prosecution were photographs of Brittany Goddard's face taken at the scene that night, which showed puffiness, redness, and the beginning of some bruising.

{¶12} The prosecution also introduced the two recorded 911 calls as evidence at trial, along with a recording of a portion of a subsequent phone call made from jail by Thomas to Goddard, and written email-type messages from the jail sent from and to Thomas. Photos taken of Goddard several days after the incident, which reflected injuries to her face, were also presented. Goddard did not testify at the trial, nor did her son Teddy.

{¶13} After the state rested its case, Thomas took the stand in his own defense. Thomas testified that Brittany Goddard is the mother of his three children. Thomas acknowledged he had been present at 329 Fies Avenue on the evening of February 12, 2022. Thomas testified that he went over to the house that day, shoveled snow, and that he and Goddard began drinking. An argument over Thomas's treatment of one of his sons ensued and, Thomas testified, he then "lost it" and struck Goddard while the couple was standing outside the home. Thomas asserted that the front window was broken when he threw a shot glass at it. Thomas testified that he followed Goddard into the house and, when he heard the police announcing themselves, he felt very hopeless and emotional, and so he grabbed a machete because he did not want to go back to jail. Thomas testified that when he heard the front door fly open, he decided to approach the police with the machete in order to provoke the police into killing him. Thomas claimed that he did not intend to cause any harm to the officers by swinging the machete, but was hoping the officers would shoot him in response. Thomas testified that when the officers did

not shoot him, he fled to the back storage room, where he continued to make threats in an effort to enrage the police to a point where they would want to kill him. Thomas testified that as time went on, he started to sober up and realized that he needed to surrender and face what he had done. On cross-examination, Thomas specifically admitted that he was guilty of Domestic Violence as charged in Count 4 of the indictment, including the allegation that he had a prior conviction for involuntary manslaughter involving a family member. Thomas continued to maintain, however, that he did not intend to hurt the police officer by swinging the machete, and that he merely did so in an effort to force the officer into shooting him.

{¶14} Following the closing arguments of counsel and instructions of law by the trial court, the jury received the case for deliberation on July 27, 2023. Later that same date, the jury returned verdicts on all counts. Thomas was found guilty on Counts 1, 2, 4, and 5. On Count 3, Thomas was found not guilty on the originally indicted charge of Aggravated Burglary, but guilty of the lesser included offense of Burglary.

{¶15} On August 31, 2023, a sentencing hearing was held. Prior to proceeding to sentencing, the trial court found Thomas to be guilty of the Repeat Violent Offender ("RVO") specifications in Counts 1 and 2 of the indictment, but found that the RVO specification in Count 3 was not applicable to the lesser included offense of which Thomas had been found guilty. The trial court further

found that Count 1 and Count 2 were allied offenses of similar import and must be merged, and the prosecution elected to proceed to sentencing on Count 1.

{¶16} The trial court then sentenced Thomas as follows: Count 1 – an indefinite prison term consisting of a minimum 11 years and a potential maximum of 16 ½ years, plus an additional 10-year prison term for the RVO specification; Count 3 – 8 years in prison; Count 4 – 18 months in prison; and Count 5 – 18 months in prison. The trial court ordered that all prison terms be served consecutively, for an aggregate minimum sentence of 32 years in prison up to a maximum of 37 ½ years in prison.

{¶17} Thomas thereafter filed the instant appeal, in which six assignments of error are raised for our review.

### First Assignment of Error

**The trial court committed reversible error by admitting two 911 calls into evidence, because the calls were not authenticated, were not business records, the dispatcher had no personal knowledge of them, the dispatcher gave substitute testimony for two other dispatchers in violation of Thomas's Confrontation right, and the substance of those calls were hearsay.**

### Second Assignment of Error

**The trial court committed reversible error by admitting Thomas's jail calls and jail mail into evidence, because the calls were not authenticated, nor were they business records.**

### Third Assignment of Error

**The trial court erred in admitting Goddard's statements through the officers who testified, because Thomas did not forfeit his right of Confrontation through wrongdoing.**

-9-

**Fourth Assignment of Error**

**The trial court committed prejudicial error in not allowing Thomas to stipulate that the prior victim for the domestic violence enhancement was a family or household member.**

**Fifth Assignment of Error**

**Because of cumulative error, Thomas was denied his right to a fair trial.**

**Sixth Assignment of Error**

**Thomas's convictions and sentences for domestic violence and inducing panic should be reversed because the verdict forms do not comply with R.C. 2945.75: There was no special finding or degree of offense listed in the verdict forms to convict Thomas and sentence him, on anything more than two misdemeanors.**

*First Assignment of Error*

{¶18} In the first assignment of error, Thomas asserts that the trial court erred when it allowed two 911 calls into evidence. Thomas argues that the recordings of the 911 calls were not properly authenticated, were inadmissible hearsay, and were testimonial statements that violated his Sixth Amendment right to confront witnesses against him.

{¶19} At trial, the prosecution introduced two recorded 911 calls in evidence, one made by Brittany Goddard (State's Exhibit 1), and one made by her young son Teddy (State's Exhibit 2).

{¶20} In State's Exhibit 1, the recording reflects that a very frantic caller, who is crying hysterically, requests police be sent to 329 Fies Avenue. The caller

identifies herself as Brittany Goddard and states that she was just assaulted by Thomas, who Goddard says is going crazy and trying to break into her house. During the course of the recorded conversation with the dispatcher, Goddard responds to multiple questions about what was happening, who was in the house with her, their location, and what the perpetrator was doing.

{¶21} In State's Exhibit 2, the recording reflects that the caller identifies himself as Teddy Thomas, and states that he is 13 years old. He reports that someone "is beating on my mom" and then, when asked, identifies the perpetrator as Teddy Thomas, III. Young Teddy then responds to additional questions and instructions by the dispatcher, relating to what was happening at the home.

{¶22} At trial, to identify those 911 recordings, the state called Marion County Sheriff's Office Sergeant Lesa Friend as a witness. Friend testified that she is employed at the sheriff's office 911 dispatch center, where she answers 911 calls, dispatches first responders, and supervises the other dispatchers. Friend explained that when someone dials 911, the call rings into the dispatch center, where the system begins recording the call. Friend testified that, when such calls ring into the dispatch center, the dispatchers then answer "911", and ask where the emergency is. Once an address is provided, a dispatcher types the address into the system, along with an appropriate call code for the type of emergency involved. Based on the call code, law enforcement or fire dispatchers will then dispatch the appropriate units. Friend testified that all phone calls to the dispatch center, be they emergency

or non-emergency, are automatically recorded and stored in the center's system, and that the dispatch center is required to maintain those records in the ordinary course of business. Friend testified that she was working on February 12, 2022, when two calls came in from 329 Fies Avenue in Marion, with one call made by a juvenile named Teddy Thomas and the other call made by an adult female whose name Friend could not recall. Two other on-duty dispatchers, whom Friend identified by name, answered those two calls. While Friend did not answer either of those calls herself, she testified that she was working at the radio console in the dispatch center at the time the calls came in. As the two dispatchers relayed the information being given by the callers to Friend, Friend then handled dispatching police officers to the address, and passing along to the officers the information she received from the two dispatchers speaking to the callers. Friend testified that she was familiar with the two calls at issue and, after hearing the recordings comprising State's Exhibit 1 and State's Exhibit 2, Friend testified that those recordings were the two calls received from 329 Fies Avenue on February 12, 2022, and that the recordings were true and accurate.

{¶23} Even though Thomas's counsel objected to the admission of State's Exhibits 1 and 2 at trial, he failed to challenge the authenticity of the exhibits in the trial court, and specifically conceded that there was no hearsay issue with the recordings. Rather, the defense objection to the 911 calls was solely that admission of the statements contained in the recordings would violate Thomas's right to

confront witnesses against him. In response, the trial court indicated that the statements contained in the 911 recordings were not testimonial and therefore overruled the defense objection.

### A. Authentication

{¶24} In this assignment of error, Thomas first argues that the recordings of the 911 calls were not properly authenticated. However, as noted above, while Thomas objected to the admission of the 911 recordings, he did not contest the authenticity of the two recordings. Accordingly, as to that issue, he has waived all but plain error. *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, ¶¶ 58-60.

{¶25} "Crim.R. 52(B) affords appellate courts discretion to correct '[p]lain errors or defects affecting substantial rights' notwithstanding the accused's failure to meet his obligation to bring those errors to the attention of the trial court." *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, ¶ 22. The appellant bears the burden of demonstrating plain error by proving that the outcome would have been different absent the plain error. *State v. Payne*, 114 Ohio St.3d 502, 2007-Ohio-4642, ¶ 17. The plain error must be a deviation from a legal rule and an obvious defect in the proceedings. *Rogers* at ¶ 22.

{¶26} "A trial court has broad discretion in the admission and exclusion of evidence. Unless the trial court has clearly abused its discretion, an appellate court should not interfere in its determination." *State v. Apanovitch,* 33 Ohio St.3d 19, 25, 514 N.E.2d 394 (1987). An abuse of discretion implies that the trial court's attitude

was unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore,* 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶27} Evid.R. 901 governs the authentication of evidence and provides, in relevant part, "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the material in question is what its proponent claims." Evid.R. 901(A).

{¶28} Thomas argues on appeal that the testimony of Sergeant Friend failed to adequately authenticate, or identify, the 911 recordings. We disagree. Friend's testimony established her familiarity with the operations and recording system of the 911 dispatch center, reflected her direct involvement with the handling of the two 911 calls when received by the center, and established the basis of her knowledge of the information contained in the calls. Friend then identified State's Exhibits 1 and 2 as the two recordings as issue, and confirmed that the recordings were accurate.

{¶29} Thus, Friend's testimony was sufficient to support a finding that the 911 recordings were what the proponent of that evidence claimed them to be, satisfying the requirements of Evid.R. 901. As to the issue of the identification of State's Exhibits 1 and 2, the trial court did not abuse its discretion, much less commit plain error, in finding the exhibits to be admissible.

### B.   Hearsay

**{¶30}** Thomas next argues that the 911 recordings should not have been allowed into evidence because they contain inadmissible hearsay.  However, as noted above, Thomas conceded at trial that there was no hearsay issue presented by the two 911 recordings, therefore raising no objection on that basis.

**{¶31}** "'Ordinarily, we review a trial court's hearsay rulings for an abuse of discretion.'" *State v. Wears*, 3d Dist. Union No. 14-22-27, 2023-Ohio-4363, ¶ 59, quoting *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, ¶ 97.  "However, when the defendant fails to prompt such a ruling by raising a timely objection to hearsay testimony at trial, all but plain error is waived on appeal." *Id*., citing *In re C.B.*, 3d Dist. Seneca No. 13-12-06, 2012-Ohio-2691, ¶ 33; *State v. Jackson*, 3d Dist. Allen No. 1-22-27, 2023-Ohio-2193, ¶ 38.

**{¶32}** "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted in the statement." Evid.R. 801(C). Hearsay is typically inadmissible unless the statement falls into a hearsay exception. Evid.R. 802.

**{¶33}** One such exception, the present sense impression exception, permits "statement[s] describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter unless circumstances indicate lack of trustworthiness." Evid.R. 803(1). This rule assumes that "statements or perceptions, describing the event and uttered in close temporal

proximity to the event, bear a high degree of trustworthiness." *State v. Dixon,* 152 Ohio App.3d 760, 2003-Ohio-2550, ¶ 12, quoting *Cox v. Oliver Machinery Co.,* 41 Ohio App.3d 28, 35, 534 N.E.2d 855 (12th Dist.1987).

**{¶34}** Under the present sense impression exception, "'[t]he key to the statement's trustworthiness is the spontaneity of the statement, either contemporaneous with the event or immediately thereafter. By making the statement at the time of the event or shortly thereafter, the minimal lapse of time between the event and statement reflects an insufficient period to reflect on the event perceived—a fact which obviously detracts from the statement's trustworthiness.'" *State v. Upshaw,* 3d Dist. Logan No. 8–02–46, 2003-Ohio-5756, ¶ 7, quoting *Cox* at 35-36, 534 N.E.2d 855.

**{¶35}** In this case, the statements made by Brittany Goddard and her son Teddy in the 911 calls fall squarely within the present sense impression exception. In both 911 recordings, the callers are describing events as the events are unfolding or immediately after perceiving the events, with no time to reflect upon their statements, and with no apparent motivation in making those statements other than seeking immediate assistance from the police.

**{¶36}** Thus, as to the hearsay issue raised by Thomas on appeal, the trial court did not abuse its discretion, much less commit plain error, in finding the 911 recordings to be admissible.

## C. Right to Confrontation

**{¶37}** Finally, Thomas argues that the admission of the 911 recordings violated his Sixth Amendment right to be confronted with witnesses against him because the recordings contained statements made by persons who did not testify at trial.

**{¶38}** The admission of a testimonial, out-of-court statement by a declarant who does not testify at trial violates the Confrontation Clause unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant. *Crawford v. Washington*, 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Thus, if a statement is testimonial, then the Confrontation Clause requires a showing of both the declarant's unavailability and the defendant's opportunity to have previously cross-examined the declarant. However, if the statement is nontestimonial, it is merely subject to the regular admissibility requirements of the hearsay rules. *State v. Siler*, 116 Ohio St.3d 39, 2007-Ohio-5637, ¶ 21, citing *Crawford*, at 68.

**{¶39}** We review evidentiary rulings that implicate the Confrontation Clause de novo. *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, ¶ 97.

**{¶40}** In *Davis v. Washington*, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), the United States Supreme Court addressed the issue of "whether the Confrontation Clause applies only to testimonial hearsay; and, if so, whether the recording of a 911 call qualifies." *Id.*, at 823. The Supreme Court reasoned that, in

911 calls, the declarants are generally facing ongoing emergencies, speaking about events as they are actually happening, and therefore the nature of what is asked and answered in such phone conversations means that the statements elicited from the caller were necessary in order to resolve the present emergency. *Id.*, at 827. For those reasons, the Supreme Court held that statements made in 911 calls of that nature are nontestimonial because the circumstances of the 911 interrogation "objectively indicate its primary purpose was to enable police assistance to meet an ongoing emergency." *Id.*, at 828. Accordingly, the admission of such statements does not violate the Confrontation Clause.

{¶41} In the instant case, the content of the two 911 recordings reflects that the callers were seeking police help in an ongoing emergency involving a threat to physical safety, and the callers' statements were made in order to provide the police with the information necessary to respond to the emergency. Thus, under such circumstances, we conclude that the statements made by the 911 callers do not qualify as testimonial in nature, and the trial court did not err in determining that the 911 recordings were admissible.

{¶42} For all of the reasons stated, the first assignment of error is overruled.

*Second Assignment of Error*

{¶43} In the second assignment of error, Thomas asserts that the trial court erred when it allowed into evidence a recorded jail phone call and several written

-18-

"jail mail" messages. Thomas argues that those exhibits should not have been admitted because they were not properly authenticated.

**{¶44}** At trial, the prosecution introduced into evidence a recording of a portion of a phone call made from the jail by Thomas to Brittany Goddard (State's Exhibit 71A), and written email-type messages sent or received by Thomas on the jail's "jail mail" system (State's Exhibits 37-43, and 72).

**{¶45}** In the jail call, the recording begins with an automated voice saying, "This is a collect call from…" and a male voice says, "Teddy Thomas". A 9-minute conversation then ensues between the male caller and the female recipient. During that conversation, among other things, the male indicates that the prosecutor has offered to drop all charges except for the attempted murder, and then states that he might possibly get a plea offer to the "felonious assault without the RVO." He also references discussing the "busted window downstairs" with his attorney, and how best to explain that at trial. He also notes to the female that she is the victim in the case.

**{¶46}** As to the jail mail, State's Exhibit 37 was a message captioned from "Teddy Thomas (Inmate: 303876)" to "Meranda Thomas", dated February 14, 2022, stating among other things, "I really need to get a hold of Brittany", "[t]here's a t.p.o. on me and that needs to get lifted", "[i]f I didn't drink these problems would not have happened", "I need to get a lawyer", "I don't deserve to go to prison", "[t]ell Britt that I love her", "[t]ell her that I love the kids with all my heart", and

"[t]tell her that I'm torn to pieces over all of this." State's Exhibit 38 was a message captioned from "Teddy Thomas (Inmate: 303876)" to "Brittany Goddard", dated February 15, 2022, stating among other things, "Please lift the t.p.o. on me", "I really need you to stand up for me", "I love you so much", "I'm sorry for what I did", and "I need help, not prison." State's Exhibit 39 was a message captioned from "Teddy Thomas (Inmate: 303876)" to "Brittany Goddard", dated February 16, 2022, stating among other things, "You know I wouldn't have done this if i [*sic*] wasn't drunk like i [*sic*] was", "Babe, they are trying to say i [*sic*] tried to kill a police officer", "[w]hen I finally sobered up in the back room i [*sic*] thought I was turning myself in over the warrant for my arrest, not for anything like what ive [*sic*] got now", and "[p]lease help me pay for a lawyer * * * [d]o it for our boys." State's Exhibit 40 was a message captioned from "Teddy Thomas (Inmate: 303876)" to "Brittany Goddard", dated February 16, 2022, stating among other things, "I didn't do any of this on purpose", "I need you to help me get a lawyer that can help me get treatment", and "[i]f I didn't drink at all I wouldn't have caused any of this to happen". State's Exhibit 41 was a message captioned from "Teddy Thomas (Inmate: 303876)" to a "Tammy Radcliff", dated February 18, 2022, repeatedly urging the recipient to contact "Brit", and stating "[i]f i [*sic*] wasn't drinking I wouldn't have gotten into any trouble." State's Exhibit 42 was a message captioned from "Teddy Thomas (Inmate: 303876)" to "Brittany Goddard", dated February 18, 2022, stating among other things, "You need to get a grip on yourself", "[t]here is a

way to solve all of this", "[i]f you keep going on like this you're going to get me put in prison forever", "I need you to see that you are the answer to success", and "I want to raise our boys and be good friends with our oldest kids." State's Exhibit 43 was a message captioned from "Teddy Thomas (Inmate: 303876)" to "Tammy Radcliff", dated February 20, 2022, stating among other things, "Tell my wife that I love her" and "if we do this right we can be reunited soon." Finally, State's Exhibit 72 was a message captioned from "Brittany Goddard" to "Teddy Thomas (Inmate: 303876)", dated February 15, 2022. In total, that message reads, "You beat the shit outta [sic] me until I was spitting up blood. My face is black and blue[.] [M]y head is knotted everywhere and body is riddled with bruises. I begged you to stop[.] [Y]ou choked me[,] punched me[,] kicked me in my face[,] ribs[,] back[,] threw me off the porch and threw shit at me from off the porch[.] [O]ur son seen [sic] everything threw [sic] his bedroom window[.] [H]e hates you for what you've done and I can't blame him. You don't do this to someone you love. You've single handidly [sic] ruined my life."

{¶47} Regarding the authentication of those evidentiary exhibits, a hearing was held during the course of the trial on the admissibility of certain evidence proffered by the prosecution. At that hearing, the state called Captain Rachel McCullough of the Multi-County Correctional Center as a witness. McCullough testified that she had been employed at the correctional center for 21 years and that her responsibilities included investigations, supervising officers, and other

-21-

administrative duties. One of McCullough's administrative responsibilities is providing law enforcement agencies with requested copies of correspondence conducted by inmates, such as jail phone calls or copies of jail mail emails. McCullough testified that she was familiar with the different technological systems that the jail uses to permit inmates to communicate with persons outside the jail. As to phone calls made from the jail by inmates, McCullough testified that the phone system is maintained by Securus Technologies and that, through that system, she is able to listen to phone calls between inmates and outside individuals. Specifically, McCullough testified that such phone calls are stored on a server provided by Securus Technologies and that she, as well as law enforcement personnel from other agencies, have the ability to log in and extract the archived phone calls. With regard to the instant case, McCullough testified that she was asked to listen to several phone calls relating to Thomas, which she did. McCullough reviewed three phone calls made by Thomas on July 10th, July 18th, and July 20th, to a phone number belonging to Brittany Goddard. McCullough identified recordings of three phone conversations as being the three phone calls made by Thomas that she had reviewed and retrieved from the jail's phone system, which were marked for identification purposes as State's Exhibit 71. Subsequently, a recording of the first nine minutes of the phone call made on July 20th was played for the jury (State's Exhibit 71A).

{¶48} To identify the jail mail exhibits, the state at trial called Detective Katelyn Barber of the Marion County Sheriff's Office, who in February of 2022 had

been working in investigations for the Marion Police Department. Barber testified that she became involved in the investigation of the instant case through reviewing jail phone calls and jail mail at the Multi-County jail. Barber explained that she was looking for communications between Thomas and Goddard that might relate to the case. To look for such communications, Barber testified that she used a "jail mail" website that is set up by the Multi-County jail, though which investigators such as herself have access to inmates' jail messages and phone calls. Barber explained that such information is stored on the system, and the system permits investigators to search by inmates' names for the archived mail, phone calls, and messages sent and received by any inmate. Barber identified State's Exhibits 37 through 43 and State's Exhibit 72 as jail mails that she located and retrieved from the system after conducting her search for Thomas's communications from the jail. She testified that those exhibits were true and accurate copies of what she located on the system.

{¶49} Even though Thomas objected to the admission of the jail phone call and jail mail messages, he failed to contest the authenticity of those exhibits. Therefore, as to that issue, he has waived all but plain error. *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, ¶¶ 58-60.

{¶50} As noted in the first assignment of error, "[a] trial court has broad discretion in the admission and exclusion of evidence. Unless the trial court has clearly abused its discretion, an appellate court should not interfere in its determination." *State v. Apanovitch,* 33 Ohio St.3d 19, 25, 514 N.E.2d 394 (1987).

**{¶51}** As also previously noted, Evid.R. 901 governs the authentication of evidence and provides, in relevant part, "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the material in question is what its proponent claims." Evid.R. 901(A).

**{¶52}** Evid.R. 901(B) provides illustrations of means to authenticate items of evidence. Relevant to the facts herein are the illustrations in Evid.R. 901(B)(1), (4), and 6, which state:

> (1) *Testimony of Witness With Knowledge.* Testimony that a matter is what it is claimed to be.
>
> ***
>
> (4) *Distinctive Characteristics and the Like*. Appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances.
>
> ***
>
> (6) *Telephone Conversations.* Telephone conversations, by evidence that a call was made to the number assigned at the time by the telephone company to a particular person or business, if (a) in the case of a person, circumstances, including self-identification, show the person answering to be the one called, or (b) in the case of a business, the call was made to a place of business and the conversation related to business reasonably transacted over the telephone.

**{¶53}** Finally, when reviewing a challenge to the admission of evidence on the basis of authentication, it is also important to note that "[t]he 'threshold requirement for authentication of evidence is low and does not require conclusive

-24-

proof of authenticity.'" *State v. Kammeyer*, 3d Dist. Seneca No. 13-19-48, 2020-Ohio-3842, ¶ 9, quoting State *v. Waver*, 12th Dist. Butler No. CA2015-08-155, 2016-Ohio-5092, ¶ 28. "Rather, the proponent of the evidence need only demonstrate a 'reasonable likelihood' that the evidence is authentic." *Id.*

{¶54} In this case, we find that the testimony of Captain McCullough and Detective Barber, when considered in conjunction with the contents of the jail call and messages themselves, sufficiently support a finding that the evidentiary items are what the prosecution claimed them to be, which satisfies the requirement for identification set forth in Evid.R. 901.

{¶55} Accordingly, as to the issue of authentication, the trial court did not abuse its discretion, much less commit plain error, in deeming those exhibits to be admissible.

{¶56} The second assignment of error is overruled.

*Third Assignment of Error*

{¶57} In the third assignment of error, Thomas asserts that the trial court allowed inadmissible hearsay statements into evidence in violation of his Sixth Amendment confrontation right. In this claim, Thomas challenges the admission of out-of-court statements of Brittany Goddard that were introduced at trial through the testimony of police officers involved in the case. The record reflects that those statements were (1) a statement made by Goddard to Officer Sebastian Walker, (2) a statement made by Goddard to Lieutenant Ed Brown, and (3) a statement made by

Goddard to Officer Caleb Rector. Specifically, Thomas argues that the trial court erred by admitting Goddard's statements under the forfeiture by wrongdoing exception.

**{¶58}** Generally, the admission or exclusion of evidence lies within the trial court's discretion, and a reviewing court should not reverse absent an abuse of discretion. *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, ¶ 62. "However, we review de novo evidentiary rulings that implicate the Confrontation Clause." *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, ¶ 97. "De novo review is independent, without deference to the lower court's decision." *State v. Hudson*, 3d Dist. Marion 9-12-38, 2013-Ohio-647, ¶ 27.

**{¶59}** The Confrontation Clause of the Sixth Amendment to the United States Constitution, made applicable to the states by the Fourteenth Amendment, provides that "'[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him * * *.'" *Crawford v. Washington*, 541 U.S. 36, 42, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), quoting the Confrontation Clause. *See also State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, ¶ 34. The United States Supreme Court has interpreted the right of confrontation to mean that admission of an out-of-court statement of a witness who does not appear at trial is prohibited by the Confrontation Clause if the statement is testimonial, unless the witness is unavailable and the defendant has had a prior opportunity to cross-examine the witness. *Maxwell* at ¶ 34, citing *Crawford* at 53-54, 124 S.Ct. 1354.

**{¶60}** "Although the Confrontation Clause generally bars the admission of an unavailable witness's testimonial statement if the defendant did not have a prior opportunity to cross-examine the witness regarding their statement, such a statement 'may nevertheless be admissible under one of the two historical exceptions to the Confrontation Clause recognized by the U.S. Supreme Court—forfeiture by wrongdoing and dying declarations.'" *State v. Smith*, 3d Dist. Defiance No. 4-21-10, 2022-Ohio-4687, ¶ 49, quoting *State v. Artis*, 3d Dist. Logan No. 8-18-40, 2019-Ohio-2070, at ¶ 14.

**{¶61}** With regard to the forfeiture by wrongdoing exception, "when defendants seek to undermine the judicial process by procuring or coercing silence from witnesses and victims, the Sixth Amendment does not require courts to acquiesce." *Davis v. Washington*, 547 U.S. 813, 833, 126 S.Ct. 2266, 165 L.Ed.2d 224. In particular, domestic violence is a crime "notoriously susceptible to intimidation or coercion of the victim to ensure that she does not testify at trial." *Id.* "While defendants have no duty to assist the State in proving their guilt, they *do* have the duty to refrain from acting in ways that destroy the integrity of the criminal-trial system." (Emphasis *sic*.) *Id*. Thus, the rule of forfeiture by wrongdoing "'extinguishes confrontation claims on essentially equitable grounds.'" *Id*., quoting *Crawford*, 541 U.S. at 62. Thus, "one who obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation." *Id.*

{¶62} In Ohio, the common-law doctrine of forfeiture by wrongdoing is codified in Evid.R. 804(B)(6). *Smith*, *supra*, at ¶ 50. Evid.R. 804(B)(6) provides:

(B) *Hearsay exceptions*. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

\* \* \*

(6) *Forfeiture by Wrongdoing*. A statement offered against a party if the unavailability of the witness is due to the wrongdoing of the party for the purpose of preventing the witness from attending or testifying. However, a statement is not admissible under this rule unless the proponent has given to each adverse party advance written notice of an intention to introduce the statement sufficient to provide the adverse party a fair opportunity to contest the admissibility of the statement.

{¶63} In relevant part, Evid.R. 804(A)(2) defines a person as "unavailable" when the person "persists in refusing to testify concerning the subject matter of the declarant's statement despite an order of the court to do so."

{¶64} "In using the forfeiture by wrongdoing exception, the State must show by a preponderance of the evidence: (1) the defendant's wrongdoing resulted in the witness's unavailability and (2) one purpose was to cause the witness to be unavailable at trial." *State v. Artis*, 3d Dist. Logan No. 8-18-40, 2019-Ohio-2070, ¶ 16, citing *State v. Henderson*, 7th Dist. Mahoning No. 16 MA 0057, 2018-Ohio-5124, ¶ 22; *State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, ¶¶ 84, 87, 90. "The State need only show the defendant's wrongdoing which caused the witness's unavailability 'was motivated in part by a desire to silence the witness.'" *Id*., quoting *Hand*, *supra*, at ¶¶ 84, 90 (a defendant can have various purposes, and the

state need not show the defendant's sole motivation was to eliminate the victim as a potential witness).

{¶65} In the instant case, the record reflects that prior to the presentation of the hearsay statements at issue, the trial court held a hearing outside the presence of the jury on the prosecution's motion to admit Goddard's hearsay statements pursuant to Evid.R. 804(B)(6). At that hearing, the State of Ohio called two witnesses, and introduced three recorded phone calls made from the jail by Thomas to Goddard, notwithstanding a "no contact" order previously imposed by the trial court. In those phone conversations, which took place in the two weeks just prior to the trial, Thomas repeatedly informed Goddard that she did not have to testify, and instructed her that she should not do so. Following the presentation of evidence and arguments by counsel, the trial court concluded that the prosecution had shown by a preponderance of the evidence that Thomas engaged in wrongdoing that resulted in Goddard being unavailable as a witness. Accordingly, the trial court ruled that Goddard's statements were admissible at trial pursuant to Evid.R. 804(B)(6).

{¶66} Contrary to Thomas's claim on appeal, we find that the record supports the trial court's determination that Thomas's wrongdoing resulted in Goddard's unavailability at trial.[1] The evidence put forth on that issue by the state

---

[1] On appeal, Thomas does not contest the trial court's determination, pursuant to Evid.R. 804(A)(2), that Goddard was "unavailable." Accordingly, our review focuses on the evidence presented of Thomas's alleged

reflected that Thomas, in the two weeks prior to the commencement of trial, exerted recurring and overbearing pressure on Goddard to disregard her trial subpoena and to refuse to cooperate in the prosecution of the charges against him, in addition to repeatedly giving her false information about the legal consequences of disregarding the subpoena, with the obvious goal of persuading her to not give testimony at trial.

{¶67} Specifically, in the first phone call, which occurred on July 10, 2023, Goddard acknowledges having been served with a subpoena to appear at trial on July 25th and 26th, and Thomas tells her "they cannot force you to do to that." Thomas then spends the better part of the fifteen-minute phone call angrily telling Goddard, repeatedly, that the subpoena is fake, that the subpoena is unlawful, that she needs to file a class action against the court and allege a violation of federal law, and that "they" cannot make her go to trial against him. When Goddard replies that she may mention those things to the prosecutor, Thomas tells her that she does not even need to meet with the prosecutor and goes on to say, "You do not have to honor a fucking subpoena. You don't have to." Thomas then instructs Goddard to plan on going to work on the 25th and 26th "because you are not honoring that court order, because it's not real." In that same phone call, Thomas cites to various sections of the United States Code which, he tells Goddard, make the subpoena unlawful and a violation of her right to equal protection. Goddard mentions that the paper she was

---

"wrongdoing", which is the finding of the trial court with which Thomas takes issue in this assignment of error.

served with said that failure to appear was punishable by up to a year in prison and a large fine, in response to which Thomas says, "They're full of shit. They're lying to you." Thomas concludes his tirade about the subpoena by telling Goddard that she needs to tell the prosecutor that he cannot do this to her, and that she is not testifying. Thomas explains to Goddard that, if she does not show up at trial, then "the whole case crumbles" and that "I've seen several people here beat cases because people didn't show up."

{¶68} In the second phone call, on July 18, 2023, Goddard references an appointment that she has with the prosecutor on July 20th. Thomas tells Goddard that she should not go to it and that he does not know why she would even want to go. Goddard then changes the subject, but Thomas persists in discussing whether she plans to go to the appointment, and berating her because she indicated she intended to go. Thomas tells her, "You going in there is like turning on a fucking oven and I'm inside the damn thing." Thomas then refers to the prosecutor as a snake, who has no authority and who cares nothing about Goddard. Thomas ends the discussion by quoting Biblical verses that, he claims, support his argument against Goddard cooperating with the prosecution.

{¶69} In the third phone call, on July 20, 2023, Goddard tells Thomas that she did not go to the meeting with the prosecutor. In response, Thomas says, "This is good because I know they're fucked on this if you're not cooperating" and, "You just saved me one hell of a fucking problem." Goddard then suggests that perhaps

Thomas will be offered a plea deal if she does not show up. In discussing that, Thomas tells Goddard that she will not get in trouble if she does not show up. Goddard expresses her concern about getting in trouble for not showing up, and Thomas continues to tell her that she faces no consequences if she does not show up for trial.

{¶70} Five days later, despite repeated efforts by the prosecutor's office to make contact with Goddard after she quit answering calls from that office, and notwithstanding the fact that a valid subpoena had been served upon her, Goddard failed to appear for trial.

{¶71} In light of that evidence establishing the relentless and coercive tactics employed by Thomas toward Goddard on the eve of trial, the trial court did not err in determining that the state had shown, by a preponderance of the evidence, that Thomas's wrongdoing resulted in Goddard's unavailability and that one purpose of the wrongdoing was to cause the witness to be unavailable at trial. Accordingly, Goddard's hearsay statements were properly admitted at trial.

{¶72} Finally, while Thomas asserts that his actions did not constitute "wrongdoing" because they were not criminal in nature, we note that Ohio case law does not require that the actions of a defendant in procuring the unavailability of a witness amount to criminal acts in order to constitute wrongdoing pursuant to Evid.R. 804(B)(6). *See, e.g., State v. Hommes*, 11th Dist. Ashtabula No. 2022-A-0065, 2023-Ohio-4868; *State v. Smith*, 3d Dist. Defiance No. 4-21-10, 2022-Ohio-

4687; *State v. Artis*, 3d Dist. Logan No. 8-18-40, 2019-Ohio-2070; *State v. Price*, 5th Dist. Delaware Nos. 2019 CA 00019 and 2019 CA 00020, 2020-Ohio-132; *State v. Harper*, 6th Dist. Lucas No. L-15-1310, 2017-Ohio-1395.

{¶73} For all the reasons stated, the third assignment of error is overruled.

*Fourth Assignment of Error*

{¶74} In the fourth assignment of error, Thomas challenges the admission at trial of evidence of his 2009 conviction for involuntary manslaughter. Specifically, Thomas argues that the trial court erred in refusing to accept a defense stipulation relating to the prior conviction and in permitting the state to present evidence of that conviction.

{¶75} Count 4 of the indictment in this case charged Thomas with Domestic Violence, a fourth-degree felony in violation of R.C. 2919.25(A) and (D)(3). Pursuant to R.C. 2919.25(D)(2), Domestic Violence in violation of R.C. 2919.25(A) is a misdemeanor of the first degree. However, pursuant to R.C. 2919.25(D)(3), Domestic Violence is a felony of the fourth degree if, as was indicted here, the offender has previously been convicted of an offense of violence and the victim of the prior offense was family or household member at the time of the offense.

{¶76} The prior conviction at issue is an element of the domestic violence offense with which Thomas was charged because the prior conviction elevates the degree of the offense, as opposed to just enhancing the penalty. *State v. Bibler*, 3d

Dist. Marion No. 9-13-70, 2014-Ohio-3375, ¶ 29, citing *State v. Allen*, 29 Ohio St.3d 53, 54, 506 N.E.2d 199 (1987).

**{¶77}** Where the existence of a prior offense is an element of a subsequent crime, the prosecution must prove the prior conviction beyond a reasonable doubt and the trier of fact must find that the previous conviction has been established in order to find the defendant guilty of the second offense. *State v. Day,* 99 Ohio App.3d 514, 517, 651 N.E.2d 52 (12th Dist.1994).

**{¶78}** At trial, Lieutenant Ed Brown of the Marion Police Department was a witness for the prosecution. While Brown was on the stand, he was asked by the state if he was familiar with Thomas from a prior investigation in 2008, which Brown answered affirmatively. Through Brown, the state then introduced a certified copy of an indictment against Thomas in a 2008 case (State's Exhibit 9) and a certified copy of the judgment entry of sentencing in that same case (State's Exhibit 10). State's Exhibit 9 reflected that Thomas had been indicted for involuntary manslaughter, the victim of which was alleged in the indictment to be Skylar Thomas.[2] State's Exhibit 10 reflected that Thomas had pled guilty to the indicted charge of involuntary manslaughter, and been sentenced thereon.

**{¶79}** In addition to identifying those documents, Brown testified that involuntary manslaughter was a felony offense of violence. The prosecutor then

---

[2] At defense counsel's request, two other counts in the indictment that were ultimately dismissed were redacted from Exhibit 9.

-34-

asked Brown who the victim was of that crime, at which point Thomas's counsel objected.

{¶80} At a bench conference outside the hearing of the jury, defense counsel acknowledged that the conviction was admissible as part of the state's case but asserted that facts about the victim were not relevant. Defense counsel further argued that introducing the facts of the offense would be extremely prejudicial to Thomas. In response, the prosecution argued that the state needed to demonstrate the prior conviction was for a felony offense of violence against a family or household member, which necessitated discussing the victim.

{¶81} The trial court ruled that the prosecution could identify the victim of the prior offense and introduce evidence that the victim was a family or household member, but that additional specifics of the prior offense could not be presented. Thomas's counsel then indicated the defense would stipulate that the victim of the prior offense was a family or household member, but that offer was rejected by the state.

{¶82} Questioning of Lieutenant Brown by the prosecutor then resumed. Brown was asked who the involuntary manslaughter victim was, and he testified that it was Thomas's infant daughter. Brown then confirmed that the victim he was referencing was the Skyler Thomas named as the victim in the 2008 indictment. No further evidence relating to Thomas's prior conviction was introduced at that time. Subsequently, when Thomas took the stand on his own

behalf, he confirmed his prior conviction and acknowledged that it involved a family or household member.

**{¶83}** The admission or exclusion of evidence generally rests within the trial court's sound discretion. *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, ¶ 62. Thus, absent an abuse of discretion, an appellate court will not disturb a trial court's ruling regarding the admissibility of evidence. *Id.* An abuse of discretion implies that a court's attitude is unreasonable, arbitrary, or unconscionable. *State v. Adams,* 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980).

**{¶84}** We begin our analysis here by considering *State v. Creech*, 150 Ohio St.3d 540, 2016-Ohio-8440, in which the Supreme Court of Ohio reviewed the case of a defendant convicted, following a jury trial, of three counts of Having A Weapon While Under Disability in violation of R.C. 2923.13. *Id.*, at ¶ 1. Pursuant to R.C. 2923.13, persons previously convicted of, or under indictment for, certain felonies are prohibited from possessing firearms. Thus, in *Creech*, the state needed to prove that the defendant had a prior conviction for a felony offense of violence or a felony drug offense. *Id.* at ¶ 34. In that case, the Ohio Supreme Court adopted the reasoning of the United States Supreme Court in *Old Chief v. United States,* 519 U.S. 172, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997), and found that the trial court abused its discretion when it did not allow the defendant to stipulate to his prior convictions and, instead, admitted evidence of the defendant's full record of prior offenses. *Id.* at ¶ 40.

**{¶85}** In so finding, the Supreme Court of Ohio applied Evid.R. 403, which provides, "[a]lthough relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Upon doing so, the Ohio Supreme Court found that the state's evidence of the "name and nature" of the defendant's prior offenses unfairly prejudiced him, whereas a stipulation that the defendant had a prior conviction within the broad categories of a felony offense of violence or a felony drug offense would have been sufficient. *Id.* at ¶¶ 36-38.

**{¶86}** In *Creech,* for the reasons stated, the Ohio Supreme Court expressly held, "[p]ursuant to Evid.R. 403, in a case alleging a violation of R.C. 2923.13, when the name or nature of a prior conviction or indictment raises the risk of a jury verdict influenced by improper considerations, a trial court abuses its discretion when it refuses a defendant's offer to stipulate to the fact of the prior conviction or indictment and instead admits into evidence the full record of the prior judgment or indictment when the sole purpose of the evidence is to prove the element of the defendant's prior conviction or indictment." *Id*., at ¶ 40.

**{¶87}** While *State v. Creech* is instructive as to the issue before us, we find that the holding in *Creech* is not applicable to the instant case, as this case is distinguishable for several reasons, and a review of the record here reflects no violation of Evid.R. 403.

**{¶88}** First, while this case presents an issue that is similar to that raised in *State v. Creech*, we note that the holding in that case was specifically deemed applicable to alleged violations of R.C. 2923.13, which is not the crime at issue here.

**{¶89}** Secondly, and more importantly, unlike the facts relied upon by the Supreme Court of Ohio in finding a danger of unfair prejudice in *Creech*, the prosecution here did not present any unnecessary and potentially inflammatory information about the facts underlying Thomas's prior conviction, nor did the prosecution argue or reference any such extraneous facts in closing argument. Rather, the evidence presented to establish the prior conviction in this case was limited to proof of the conviction itself and the fact that the victim thereof was a family member of Thomas's, specifically his daughter, as alleged in the Domestic Violence charge in the indictment.

**{¶90}** In this case, unlike *State v. Creech*, because there was no additional evidence presented or argued about the facts involved in the prior conviction, we find that the jury was unlikely to ascribe unfair prejudice. Here, there is little conceivable difference in terms of potential impact on the jury between the information that would have been contained in the suggested stipulation and the evidence actually presented about the prior conviction. Therefore, Evid.R. 403 did not require exclusion of the evidence at issue.

**{¶91}** Additionally, unlike the situation in *Creech*, the record is silent regarding any pretrial discussion about the issue of Thomas's prior conviction and

whether a stipulation was requested by the defense. By the time the issue regarding proof of the prior conviction arose at trial and the defense objected and then offered to stipulate, the state had already presented evidence that Thomas had previously been convicted of involuntary manslaughter, a felony offense of violence, and the state was in the middle of inquiring about the victim of that offense, in order to establish that she was a family member of Thomas's. After the trial court overruled a defense objection to that potential testimony on the basis of relevance and unfair prejudice, it was only then that defense counsel indicated the defense would stipulate to the fact that the victim was a household or family member. The record reflects that the prosecution declined to accept that stipulation, but that the trial court did not expressly rule on the stipulation issue. Notably, defense counsel then lodged no objection specifically regarding the suggested stipulation. We find that the absence of a timely pre-trial request for a stipulation and the lack of an objection to that request being declined also serve to distinguish this case from *State v. Creech*.

{¶92} Finally, in declining to apply *Creech* to the instant case, we note that other appellate decisions in Ohio have found the holding in *Creech* to be inapplicable to cases that were analogous to *Creech* but factually distinguishable, for reasons similar to the ones relied upon here. *See, e.g., State v. Wood*, 2nd Dist. Clark No. 2016-CA-69, 2018-Ohio-875; *State v. S.D.K.*, 8th Dist. Cuyahoga No. 109195, 2021-Ohio-63; *State v. Cook*, 12th Dist. Warren No. CA2020-08-053,

2021-Ohio-2157; *State v. Walker*, 8th Dist. Cuyahoga No. 110741, 2022-Ohio-1238.

{¶93} Thus, because Thomas's prior conviction and his relationship with the victim were elements of an offense with which he was charged, and because the jury was not presented with extraneous information which may have been unduly prejudicial, the trial court did not abuse its discretion in permitting the prosecution to introduce evidence of those elements in the manner done.

{¶94} The fourth assignment of error is overruled.

*Fifth Assignment of Error*

{¶95} In the fifth assignment of error, Thomas argues that the cumulative effect of errors in the trial court denied him a fair trial. Specifically, Thomas asserts that the cumulative effect of the errors that he alleged in his first four assignments of error amounted to reversible error.

{¶96} "Under [the] doctrine of cumulative error, a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial court error does not individually constitute cause for reversal." *State v. Spencer*, 3d Dist. Marion No. 9-13-50, 2015-Ohio-52, ¶ 83, citing *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, ¶¶ 222-224, and *State v. Garner*, 74 Ohio St.3d 49, 64, 656 N.E.2d 623 (1995).

{¶97} "'To find cumulative error, a court must first find multiple errors committed at trial and determine that there is a reasonable probability that the

outcome below would have been different but for the combination of the harmless errors.'" *State v. Stober*, 3d Dist. Putnam No. 12-13-13, 2014-Ohio-5629, ¶ 15, quoting *In re J.M.*, 3d Dist. Putnam No. 12-11-06, 2012-Ohio-1467, ¶ 36.

**{¶98}** Because we did not find multiple errors as alleged by Thomas in the first four assignments of error, and because there is no reasonable probability that the trial outcome would have been different but for the matters Thomas has raised on appeal, the doctrine of cumulative error does not apply. *State v. Bertuzzi*, 3d Dist. Marion No. 9-13-12, 2014-Ohio-5093, ¶ 110.

**{¶99}** The fifth assignment of error is overruled.

*Sixth Assignment of Error*

**{¶100}** In the sixth assignment of error, Thomas argues that the verdict forms relating to Count 4 (Domestic Violence) and Count 5 (Inducing Panic) were insufficient to convict him of the level of those two offenses as charged in the indictment.

**{¶101}** In Count 4, Thomas was charged with Domestic Violence, a fourth-degree felony in violation of R.C. 2919.25(A) and (D)(3). Pursuant to R.C. 2919.25(D)(2), Domestic Violence in violation of R.C. 2919.25(A) is a misdemeanor of the first degree. However, pursuant to R.C. 2919.25(D)(3), Domestic Violence is a felony of the fourth degree if, as indicted here, the offender has previously been convicted of an offense of violence and the victim of the prior offense was family or household member at the time.

-41-

{¶102} In Count 5, Thomas was charged with Inducing Panic, a fourth-degree felony in violation of R.C. 2917.31(A)(2) and (C)(3). Pursuant to R.C. 2917.31(C)(2), Inducing Panic in violation of R.C. 2917.31(A)(2) is a misdemeanor of the first degree. However, pursuant to R.C. 2917.31(C)(3), Inducing Panic is a felony of the fourth degree if, as was indicted here, the violation results in physical harm to any person.

{¶103} The verdict forms for Count 4 and Count 5 did not set forth the additional enhancing elements of the indicted offenses, nor did the verdict forms indicate the degree of the offenses charged. Because of that, Thomas asserts that he could only be properly convicted of the lowest forms of those two offenses, pursuant to R.C. 2945.75 and *State v. Pelfrey*, 112 Ohio St.3d 422, 2007-Ohio-256.

{¶104} R.C. 2945.75(A)(2) provides the following with regard to verdicts:

(A) When the presence of one or more additional elements makes an offense one of more serious degree:

* * *

(2) A guilty verdict shall state either the degree of the offense of which the offender is found guilty, or that such additional element or elements are present. Otherwise, a guilty verdict constitutes a finding of guilty of the least degree of the offense charged.

{¶105} In *State v. Pelfrey*, 112 Ohio St.3d 422, 2007-Ohio-256, the Supreme Court of Ohio considered the effect of noncompliance with R.C. 2945.75(A)(2). In that case, Pelfrey was convicted of Tampering with Records, a third-degree felony in violation of R.C. 2913.42(A)(1) and (B)(4). *Id*., at ¶ 3. Pursuant to R.C.

2913.42(B)(3)(a), Tampering with Records in violation of R.C. 2913.42(A)(1) is a misdemeanor of the first degree; however, pursuant to R.C. 2913.42(B)(4), if the records at issue are kept by or belong to a governmental entity, that additional element elevates the crime to a felony of the third degree.

{¶106} In *Pelfrey*, the defendant was indicted with the third-degree felony version of Tampering with Records, with the charge including the enhancing "government records" language from R.C. 2913.42(B)(4). *Pelfrey*, ¶ 3. See, also, *State v. Pelfrey*, 2d Dist. Montgomery No. 19955, 2005-Ohio-5006. ¶ 10. However, at trial, the verdict form for that charge merely stated:

> We, the jury, upon the issues joined in this case, do find the Defendant, David L. Pelfrey, Guilty of the offense of Tampering With Records as charged in the indictment.

*Id.*

{¶107} On appeal, Pelfrey argued that the verdict form did not comply with R.C. 2945.75(A)(2) and thus the conviction had to be reduced to the lowest degree of the offense, a first-degree misdemeanor. *Pelfrey*, 112 Ohio St.3d 422, 2007-Ohio-256, ¶ 4. The Supreme Court of Ohio agreed, even though Pelfrey had not objected to or raised the adequacy of the verdict form at trial, and even though the verdict form incorporated by reference the offense charged in the indictment. *Id.*, at ¶ 1.

{¶108} Thus, in *Pelfrey*, the Supreme Court of Ohio held that even in a plain error review, a verdict form must include the aggravating element or the degree of the offense, as specified in R.C. 2945.75, and a verdict form that does not comply

with R.C. 2945.75 cannot be cured by overwhelming evidence of the enhancing element or incorporation of language from the indictment. *Pelfrey*, ¶ 14. The Supreme Court of Ohio reasoned that R.C. 2945.75 was clear and complete and "[t]he statutory requirement certainly imposes no unreasonable burden on lawyers or trial judges." *Id.* at ¶¶ 11-12.

{¶109} In 2008, the Ohio Supreme Court considered *Pelfrey*'s application to the R.C. 2921.04 offense of Intimidation of a Victim or Witness when it accepted the certified question: "Is the holding in *State v. Pelfrey,* 112 Ohio St.3d 422, applicable to charging statutes that contain separate sub-parts with distinct offense levels?" *See State v. Sessler*, 116 Ohio St.3d 1505, 2008-Ohio-381. The court answered that question in the affirmative and affirmed the judgment on authority of *Pelfrey,* without opinion. *State v. Sessler*, 119 Ohio St.3d 9, 2008-Ohio-3180, ¶ 1.

{¶110} Despite the seemingly unequivocal stance of the Supreme Court of Ohio in *Pelfrey*, approximately five years later, in *State v. Eafford*, 132 Ohio St.3d 159, 2012-Ohio-2224, the Supreme Court of Ohio held that a verdict form referencing the charge as contained in the indictment could be sufficient to satisfy R.C. 2945.75 in a drug possession case where the only drug ever mentioned at trial was cocaine and the jury was instructed that in order to convict the defendant "of possession of drugs as charged in Count Two" it had to find "the drug involved to be cocaine or a compound, mixture, preparation, or substance containing cocaine." (Emphasis deleted.) *Eafford* at ¶ 17. Thus in *Eafford*, the Supreme Court of Ohio

seemed to contradict *Pelfrey* and hold that circumstances outside the verdict form could be considered in plain error challenges, such as the evidence and the jury instructions. However, the *Eafford* majority did not specifically overrule *Pelfrey*. The dissenting justices in *Eafford* noted that *Pelfrey* would have compelled a different result because circumstances outside of the verdict form should not be considered pursuant to R.C. 2945.75.

{¶111} Finally, just over a year after *Eafford* was decided, the Supreme Court of Ohio released *State v. McDonald*, 137 Ohio St.3d 517, 2013-Ohio-5042, in which the Court appeared to backtrack its stance from *Eafford*. In *McDonald*, the Ohio Supreme Court stated that "*Pelfrey* makes clear that in cases involving offenses for which the addition of an element or elements can elevate the offense to a more serious degree, *the verdict form itself* is the only relevant thing to consider in determining whether the dictates of R.C. 2945.75 have been followed." (Emphasis added.) *State v. McDonald*, 137 Ohio St.3d 517, 2013-Ohio-5042, ¶ 17. Notably, neither the majority nor the dissenting opinions in *McDonald* referenced *Eafford*.

{¶112} As this Court recently noted in *State v. Shockey*, 3d Dist. Marion No. 9-23-22, 2024-Ohio-296, at ¶ 34:

> Ohio Appellate Courts have recognized that *Pelfrey*, *Eafford*, and *McDonald*, "have led to some confusion regarding what is required to comply with R.C. 2945.75(A)(2) and to what extent a failure to strictly comply with R.C. 2945.75(A)(2) is subject to a plain-error analysis[.]" *State v. Sanders*, 8th Dist. Cuyahoga No. 107253, 2019-

Ohio-1524, 2019 WL 1858880, ¶ 47; *State v. Barnette*, 7th Dist. Mahoning, 2014-Ohio-5405, 26 N.E.3d 259, ¶ 30; *State v. Sanders*, 2016-Ohio-7204, 76 N.E.3d 468, ¶ 72 (5th Dist.) ("The puzzling effect of this line of cases arises in part because the *Eafford* majority does not mention *Pelfrey* and its decision is inconsistent with *Pelfrey*. In both cases * * * the defendants did not object to the verdict forms."); *State v. Robinson*, 2019-Ohio-2155, 137 N.E.3d 501, ¶ 23 (4th Dist.).

**{¶113}** While this Court would welcome greater clarity on this issue from the Supreme Court of Ohio, particularly in a plain error context, we have previously held that we are compelled to follow the holding in *McDonald*, *supra*, as it is the most recent pronouncement from the Ohio Supreme Court on this issue. *Shockey*, at ¶ 36. *See also State v. Duncan*, 3d Dist. Logan No. 8-12-15, 2014-Ohio-2720. Accordingly, we must apply the *Pelfrey/McDonald* rule to this case, which requires strict compliance with R.C. 2945.75 and does not permit consideration of factors outside the four corners of the jury's verdict forms.

**{¶114}** In the instant case, the verdict form for Count 4 read:

We, the jury in this case, being duly impaneled and sworn, find the Defendant, Teddy Gene Thomas, III *GUILTY on the offense of Domestic Violence [R.C. 2929.25(A)] as charged in Count 4 of the Indictment.

(Brackets in original.) (Docket No. 174).

**{¶115}** Similarly, the verdict form for Count 5 read:

We, the jury in this case, being duly impaneled and sworn, find the Defendant, Teddy Gene Thomas, III *GUILTY on the offense of Inducing Panic [R.C. 2917.31(A)(2)] as charged in Count 5 of the Indictment.

(Brackets in original.) (Docket No. 175).

{¶116} Thus, a review of the verdict forms reveals that the forms do not mention the aggravating elements of the crimes charged in Count 4 and Count 5, nor do the forms cite the degree of the offenses charged in the indictment. Therefore, Thomas could only be convicted of the lowest degree of the offenses at issue in those counts, because the verdict forms did not comply with R.C. 2945.75(A)(2).

{¶117} Thomas's felony convictions in Counts 4 and 5 must be reversed, and the case remanded for the trial court to enter convictions on the lowest form of the offenses and sentence Thomas accordingly.

{¶118} The sixth assignment of error is sustained.

*Conclusion*

{¶119} Having found error prejudicial to Thomas in the sixth assignment of error, we reverse the judgment of the Marion County Common Pleas Court to the extent noted in that assignment of error, and remand the case for the trial court to enter a judgment convicting Thomas on the lowest forms of the offenses charged in Counts 4 and 5 and to impose sentence accordingly. The remaining assignments of error are overruled.

*Judgment Affirmed in Part,*
*Reversed in Part,*
*And Cause Remanded*

**WILLAMOWSKI, P.J. and ZIMMERMAN, J., concur.**

**/hls**